## JOHN M. HANNA v. THE MINNESOTA LIFE IN-SURANCE COMPANY, Appellant.

**Division Two, March 21, 1912.**

1.  **CONTRACT: Fiduciary Relation: Insurance Company: Agent.** A general agent for an insurance company made a contract with the company by the terms of which all funds received by the agent were trust funds, not to be used by the agent, but to be remitted to the company. *Held*, that the relation thus formed was a fiduciary one, which was not altered in practice by the fact that when the agent settled with the company under his previous contract containing the same terms, he failed to account for certain first-premium notes and the company allowed him special favors in order to pay for those notes, and that an official of the company soon after the making of the last contract directed the agent to cash all premium notes at once—and this view is strengthened by the fact that after the last contract was made the company wrote the agent a letter calling his attention to the fiduciary clause, censuring him for selling a premium note and failing to reimburse the maker when rejected, and warning him that his conduct was an unlawful conversion of another's property.

2.  **PRINCIPAL AND AGENT: Insurance: Authority to Sell Premium Notes.** Authority to a general insurance agent to sell premium notes is not permission to convert the proceeds to the agent's own use.

3.  **EMBEZZLEMENT: Trust Fund: Failure to Account: Evidence.** The statute defining embezzlement does not make the failure to account for a trust fund, or a fund received by an agent or officer, an offense, but the essence of the offense is the wrongful conversion of the fund. The failure to account may, however, be material evidence tending to establish the act of conversion.

4.  ————: **Definition.** Embezzlement is the fraudulent and felonious appropriation of another's property by a person to whom it has been intrusted or into whose hands it has lawfully come.

5.  ————: **Proof Covering Part Only of Sum Charged.** The general agent for an insurance company was prosecuted for embezzling three first-premium notes. He took these notes payable to himself, immediately cashed them, paid the sub-agents their commissions and, in violation of his contract with the company making all funds in his hands fiduciary, converted the remainder to his own use. When the applications with

which the three premium notes were taken, were rejected, the sub-agents' refunded to the general agent.  The agent asserted upon the trial that before this refunding by the sub-agents he had made a claim against the company for reimbursement for sums advanced on account for sub-agents in other transactions and that therefore the money so refunded to him could be retained and he could not be guilty of embezzlement because the whole amount charged had not been converted.  *Held*, that a prosecution for the embezzlement of a certain sum can be sustained by showing the embezzlement of any portion of that sum.

6. ————: When Offense is Completed: Efforts to Atone.  The offense of embezzlement is complete at the time of conversion and is not tolled by subsequent claims or efforts at atonement.

7. ————: Conversion: Evidence: Criminal Intent.  Where in a prosecution for embezzlement the admitted facts show a conversion of part of the items charged before any counterclaim was made or entertained by the defendant, such conversion is a fact from which the jury would be authorized to infer a criminal intent.

8. MALICIOUS PROSECUTION: Duty of Court and Jury.  When the facts in an action for malicious prosecution are undisputed, it is the duty of the court to declare their legal effect; when they are disputed, it is for the jury to determine the question under proper instructions.

9. ————: Reasonable Doubt: Evidence.  In no case can an action for malicious prosecution be sustained where there was probable cause.  *Held*, that in this case there was probable cause.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

REVERSED.

*Warner, Dean, McLeod & Timmonds* for appellants.

*Reed, Yates, Mastin & Harvey* for respondents.

ROY, C.—This action for malicious prosecution was brought in the circuit court of Jackson county, resulting in a judgment for plaintiff for $3500 on the first count and $8500 on the third count, the second

count being dismissed by plaintiff.   Defendant appeals.

This proceeding is the result of a charge of embezzlement made by the insurance company against plaintiff, who was a member of the firm of Hanna & Redmon, who were the general agents of the company of Kansas City.   Redmon was made a party defendant herein, but has been practically ignored as a party defendant by both sides and hereafter, for convenience, unless otherwise necessary, we shall speak of the firm as Hanna, and of the company as the defendant.

The contract, so far as necessary to be stated, was as follows:

This agreement, made this 16th day of January, 1904, between the Minnesota Mutual Life Insurance Company, of St. Paul, Minnesota, first party, hereinafter referred to as the company, and J. M. Hanna and J. B. Redmon, copartners, as Hanna & Redmon, of Kansas City, in the State of Missouri, second party, hereinafter referred to as the agents of the company:

Witnesseth:   That the company does hereby appoint the said agents for the purpose of establishing and maintaining an agency in the State of Missouri and in Indian Territory (except the following counties in the State of Missouri, viz.:   St. Louis, Jefferson, Ste. Genevieve, Perry, St. Francois, Washington, Crawford, Franklin, Gasconade, Warren, St. Charles, Lincoln, Pike, Audrain, Callaway and Montgomery); the appointment and supervision of local or subagents in said territory and of personally canvassing for applications of insurance on the lives of persons who shall be satisfactory to the company, and for the purpose of collecting and paying over premiums on such insurance when effected in person or through local or sub-agents and of performing such other duties as may be required by the company in connection therewith.   This appointment and its continuance are based on the following terms and conditions, which are agreed to by each party hereto:

First:   The said agents shall act exclusively for The Minnesota Mutual Life Insurance Company, so far as to tender it all risks or applications obtained by them or by any local or sub-agents appointed by them.   They shall earnestly and faithfully solicit applications for insurance and to this end will cause the territory herein mentioned to be thoroughly and ably canvassed by them and by their local or sub-agents, to be appointed by them as hereinafter provided, for whose fidelity and honesty and indebtedness, if any, to the company they shall be responsible to the company.   They shall be governed in the business of their agency

241 Mo.—25

strictly by the written and printed instructions which they may receive from time to time from the company, consistent with this agreement and their duties hereunder.

Second: Said agents shall keep accurate and regular books of account, of· all their local or sub-agents' transactions, for or on behalf of said company, and shall on or before the 10th day of each month, or oftener, if required, transmit to said company a report in detail embracing every item of insurance done by them, or through or under them by local or sub-agents, up to and including the last day of the preceding month, or period since the last report, showing the balance due the company, which balance must be remitted with their monthly or more frequent reports, to the company, by check or draft drawn to the order of the Minnesota Mutual Life Insurance Company. Said report shall show a list of all new policies remaining on hand, and all policies not delivered and paid for within ninety days from the dates respectively of their receipt, by the agent from the company must be returned to the home office.

Said agents agree that all books of account, documents, vouchers, and other books or papers connected with the business of said company shall be the property of the company and at any and all times to be open to the officers of the company, the manager of agencies and other duly authorized representatives, and be freely exhibited for the purpose of examination and shall be immediately returned to the company upon request.

Third: It is expressly agreed and understood that all moneys or securities received or collected for or on behalf of the company by said agents or by any local or sub-agents appointed by them, shall be held by the agents hereby appointed as a fiduciary trust, and shall not be used by them for any purpose whatever, but shall be remitted to the company as provided above.

Fourth: The said agents have no authority on behalf of the company to make, alter, or discharge any contract or waive forfeitures or receive any moneys due or to become due to said company, except on policies and renewal receipts signed by an officer of the company, sent them for collection, or on other written authority.

They shall have no authority to accept or receipt for any renewal premium for which the regular receipt signed by the secretary or other officer is not then in their possession, nor shall they have any authority to accept any new or renewal premiums past due, otherwise than conditionally upon the approval of the company.

Fifth: Within said territory said agents shall have the right, but by written contract only, to appoint local or sub-agents subject to the approval of the company and to such terms and conditions and to such rules and instructions as the company may establish.

Sixth: In consideration of and conditioned upon the prompt and faithful performance of said agents' duties hereunder, and

of the performance by their local or sub-agents of their duties and services, as herein provided for, the company agrees:

· (a) To allow and pay the said agents commissions upon the first year's premiums paid and collected in cash on policies issued by the company upon applications procured by said agents personally or through their local or sub-agents as follows: Participating policies. On ordinary life, twenty payment life, twenty year endowment, twenty-five year endowment and thirty year endowment, fifteen and twenty year accumulation policies, 75 per cent. Special commission rates on other forms of policies will be fixed and determined by the company from time to time when necessary.

In addition to the commissions above mentioned, the company will allow and pay said agents a bonus of three and 50-100 dollars ($3.50) on each one thousand dollars of participating insurance, other than term, written and paid for in said territory; said amount to be deducted from the premium before remitting to the company, whenever practicable, or if not so deducted, to be thereafter accounted for and remitted by the company to the agents monthly.

Prior to the 16th day of January, 1904, Hanna was the general agent of the company at Kansas City and with reference to his settlement of his accounts up to the date of the Hanna & Redmon agency, Mr. Palmer, the president of the company, testified, "At the close of the period when the new contract was made, according to the best of my recollection, there were some notes that were not accounted for, and, in order to aid Mr. Hanna in accounting for them, we allowed him a bonus which was not to be paid until his business had been entirely settled for, and bonus was allowed in addition. I do not mean to say Mr. Hanna was guilty of any dishonest practice at all."

Many sub-agents were appointed by Hanna. He and Redmon were both much of the time actively in the field soliciting.

Whenever an application for insurance was obtained, the agent would receive from the applicant the first premium. As a general rule that premium was paid by a note payable to the agent. If Hanna was present the note was made to his order. A receipt for the premium was given the applicant, which contained the following clause: "In case the application shall not

be approved, the full amount of such payment to be promptly returned to the applicant.'' The application after being registered in the Kansas City office, was forwarded with the medical examination to the home office. If the application was rejected, the Kansas City office was notified, the notice having these words: "If ———— has given cash or notes in payment of his first premium, kindly reimburse him.''

Hanna testified that he always sold the premium notes which he received as soon as received, without waiting for the action of the home office on the application. When the policy was delivered to the applicant the company's receipt was given for the first premium which receipt was required to be countersigned by Hanna & Redmon for every policy issued in their territory.

Plaintiff at the trial testified that just after the contract of January 16th was executed, Mr. O'Shaughnessy, representing the company, told him to cash the premium notes as soon as received; and from that plaintiff claimed he had the right to cash the notes and use the money for his own purpose, repaying the company from time to time in the course of business. Mr. O'Shaughnessy was not a witness; but the following letter was read in evidence and the plaintiff admitted that he received it in the ordinary course of business.

St. Paul, Minn., April 18, 1904.

MESSRS. HANNA & REDMON,

514 Century Building, Kansas City, Missouri.

Gentlemen: We have had numerous communications from Mr. Alvin Grafford of Urich, Missouri, since March 2, 1904, and now have received one from his attorney, demanding the immediate return of the note for $86.76 which he gave Mr. Redmon at the time he took his application.

We have written you four or five times on the subject, requesting that the matter be disposed of without further delay, and have promised Mr. Grafford that it would be. I am informed that he gave Mr. Redmon a note when the application

was taken, and that the note has been discounted at one of the local banks. The application was rejected February 23d and you were promptly notified. The note and the proceeds thereof were received in trust, and certainly could not become the property of the company nor of the agent in whole or any part, until the application was approved and the insurance placed in force. The application having been rejected it followed that neither the note nor the proceeds thereof could ever become the property of the agent or the company, but remains the property of Mr. Grafford and should have been returned to him at once. Allow me to call your attention to the third clause of your contract:

"It is expressly agreed and understood that all moneys or securities received or collected, for or on behalf of the company by said agents or by any local or sub-agent appointed by them, shall be held by the agents hereby appointed as a fiduciary trust, and shall not be used by them for any purpose whatever, but shall be remitted to the company as above provided."

All of the communications of the company on the subject have been absolutely ignored by you, so far as any reference to the same having been made in the letters addressed by you to the home office. You must realize that no company can maintain its reputation and standing before the public, or with the insurance department, and transact business as you have done it in this case, and I am informed by the assistant secretary, that there are two or three other similar cases concerning which he is in correspondence, and you must realize or are liable to, that your failure to take up the note and return it, is not an ordinary breach of contract, but operates as an unlawful conversion of another's property. This matter must have immediate attention, and I trust it will not be necessary to address any more letters to you on the subject.

Very truly yours,

T. R. PALMER, President.

The plaintiff also admitted getting the following letter:

St. Paul, Minn., July 5, 1904.

MESSRS. HANNA & REDMON,

514 Century Building, Kansas City, Mo.

Gentlemen: This morning we received from superintendent of insurance of Missouri, a letter, copy of which is enclosed, also copy of letter from Mr. Crews which insurance superintendent forwarded for our perusal and I likewise enclose a copy of my reply to the insurance department. We have had two or three cases called to our attention where premiums on applications

Hanna v. Insurance Co.

taken by your agents have not been returned within a reasonable time after your receiving notice of rejection. Is it not possible to avoid these unfortunate conditions which result in complaints against the company? The company has always stood well with the Missouri insurance department and we do not wish to have its good name destroyed if by any possible efforts on our part and that of the company's agents it can be avoided.

Yours very truly,

T. R. PALMER, President.

The amount of business done through the Kansas City office was very satisfactory, but there were complaints from the company as to the accuracy of the reports sent in and as to alleged failure to return premiums to the applicants when applications were rejected or postponed.

On August 19th the company wrote the Kansas City office objecting to some items of office expense, but congratulating them on the amount of business done. About that time Mr. O'Shaughnessy called on Hanna and discussed the situation with him. On August 31st plaintiff sent in his resignation to take effect September 30th, which contained the following:

"I herewith hand you my resignation to take effect September 30, 1904. Under the thirty day clause in the contract, we will be able to clean our business all up by that time, with what we have here on the books by way of margins and bonuses, and what will come in within the next thirty days and what we have due us from our contract. We are advised by our counsel that the contracts with the agents are the contracts of the company, and not with us, and you are holding the contracts and you certainly know what to do. We will gladly furnish you with all the information in regard to the several amounts due from these parties, but I presume you have this or memorandums.

"With kindest regards, I wish to remain,

"Yours,

"J. M. HANNA."

Following that resignation, the company sent its representative, Mr. Hageman, to make a settlement with various persons whose applications had been rejected and who had paid premiums to Hanna or the sub-agents, and Mr. Hageman about December 13th presented to Hanna a statement of the amounts so paid by it, a summary which is as follows:

| "Item | 1. | Ellis note May 27 | $155.30 |
| " | 3. | Short note July 15 | 86.73 |
| " | 3. | Short note July 15 | 86.73 |
| " | 4. | Clarkson note June 22 | 129.23 |
| " | 5. | O. T. Baffrey | 65.98 |
| " | 6. | Am'ts paid Hanna by sub-agents | 215.08 |
| " | 7. | Shortage in report of July 10 | 45.60 |
| " | 8. | Net prems. $54. Perry pol. $8.70 | 62.70 |

"$835.87"

The second, third and fourth items of the above statement are the ones on which the criminal prosecution complained of were based.

The dates shown in the above items were the dates of the applications in those respective cases. The plaintiff on the trial testified that he took the notes mentioned in the first four items of that statement payable to himself and immediately cashed them at the local banks, paid the sub-agents half the commissions (37½%) less expenses, and that he made no entry on any book of such items and converted to his own use all except what he paid sub-agents as their commission, and that on the rejection of the applications the sub-agents refunded to him the amounts paid them, which he never accounted for to the company. It should be stated that plaintiff stated in his testimony that he had accounted to the company for $3.57 of the Plant item.

He also admitted liability for a portion of the other items in defendant's statement.

At the trial of this cause the plaintiff claimed he was not responsible to the company for the above amounts for the reason that the company owed him for amounts which he had paid to applicants who had been rejected by the company in cases where the premiums had been paid by the applicants to the sub-agents but had never been received by Hanna, and also where Hanna had paid to the company "net" premiums collected by sub-agents and not received by Hanna. The "net" premium was what was due the company after taking out the commission. The amounts claimed to be so paid and the names of the sub-agents for whom paid are shown in his statement as follows:

"Kansas City, Mo., October 3, 1904.

"Amount of money paid by J. M. Hanna to agents for the Minnesota Mutual Life Insurance Company:

| | | |
|---|---|---|
| John M. Woods, Agent | | $100.00 |
| Wm. T. Johnson, | " | 55.00 |
| W. H. Barnes, | " | 135.00 |
| G. W. Scott, — | " | 65.00 |
| J. R. Steele, | " | 40.00 |
| C. J. Gilman, | " | 24.00 |
| H. A. Bulkley, | " | 40.00 |
| R. P. Gwinn, | " | 50.00 |
| W. H. Gephart, | " | 40.00 |
| | "Total, | $549.00" |

As bearing on the question of the *bona fides* of that claim, the plaintiff testified at the trial that he had consulted Mr. Bremmerman, a lawyer, who advised him that he was not liable for sub-agents, and that in the settlement of his accounts he could offset the amounts so paid by him against the amounts claimed by the company, and that he told Mr. O'Shaughnessy so in August. On the other hand, he testified as follows:

"Q. I will ask you to tell the jury what statement if any you made to Mr. O'Shaughnessy in the

conversation that you had with him, in reference to any claim you made on the company on account of these matters of money paid out by you? A. Up to that time I had made no claim against the company for these amounts, and I told Mr. O'Shaughnessy I was getting tired of paying out for rejections to sub-agents, and that Redmon wouldn't stand half the loss—that he was always very free with the profits coming in but not with the losses coming in. He said Redmon ought to stand his share of the losses, and I had a talk with Redmon about it while Mr. O'Shaughnessy was in the city, and Redmon said any money paid out by rejections is not mine.

"A.   Well, I told Mr. O'Shaughnessy that Redmon refused to pay any part of the losses sustained by the firm, and he agreed with me that he ought to pay his share of the losses. These men that had been rejected would draw sight drafts on the firm of Hanna & Redmon, and I was working most of the time, and when I would come in they would be presented to me and if I had the money in the bank I would pay them, expecting an offset on account with my partner when the profits would come in, but he always managed to get his profits before there was any chance so far as an accounting, and I got tired of that kind of business."

He also testified as follows:

"Q.   Now, then, I understand that after you took this advice—when was it you took this advice of Mr. Bremmerman? A. I presume it must have been July or possibly August; I remember that Mr. Hamilton was away on a vacation, it must have been in July.

"Q.   Long before Mr. O'Shaughnessy had the conversation with him to which you have adverted in your testimony? A. Yes, sir.

"Q.   Was Mr. Bremmerman as attorney to you consulted in the matter? A. I think so.

"Q.   Or in any of the matters connected with this

business? A. No, I think Mr. Hamilton and he talked the matter over.

"Q. Touching your responsibility for the conduct of your sub-agents? A. I think not that particular clause in the contract.

"Q. Now, at the time you consulted Mr. Bremmerman I understood you to say that you were then advised that you were not responsible for moneys paid by applicants to sub-agents in case the application was rejected and the applicant became entitled to have his or their money back; am I right? A. I think so.

"Q. Then after this consultation in July or August, did you ever pay back any claims to applicants of that character? A. I think I did; I think I paid them up until the time I severed my connection with the company.

"Q. So then you did not follow the advice of your attorney? A. Not necessarily, no, sir.

"Q. Then after you got this advice as you claim you got, you did recognize claims by applicants for the return of money they had paid your sub-agents? A. I think I did.

"Q. In case where you had not received the money or any part of it from the sub-agents? A. There was sometimes cases of that kind.

"Q. So then you continued to recognize the responsibility for the conduct of your sub-agents, in these rejections, after you received this advice just as you did before you received the advice? A. I continued to pay those until I found out my partner would not stand for his half of the loss and then I refused to pay.

"Q. You paid until you got tired? A. Yes, sir.

"Q. Until the burden became too great for you to bear according to your opinion what you ought to bear; am I right? A. Yes, sir.

"Q. And then after you left the company you continued to recognize your responsibility for the

claims arising on account of rejections for moneys paid by applicants to your sub-agents during the time you were connected with the business, didn't you? A. I cannot tell you the date I ceased to recognize my responsibility; Mr. O'Shaughnessy sent me a number of policies over to my office.''

On August 26th Hanna wrote a letter to his firm in which he said, ''I guess we will be able to care for all the kicks that come if we keep up the gait we are on.''

With reference to that letter he testified as follows:

''Q. And these kicks which you referred to were demands made by applicants who had paid by cash or note and were rejected, weren't they? A. I think that had reference to the little complaints made by the company to us direct.

''Q. Little complaints about what? A. About us not going down in our pockets and paying the rejections for the sub-agents.

''Q. That referred to demands made on you for rejections on account of sub-agents applications? A. Yes, sir.

''Q. And you then expressed the opinion this way August 26th? A. Yes, sir.

''Q. Five days before you wrote your resignation? A. Yes, sir.

''Q. And you were then of the opinion that if the business kept up the gait you were going, you would be able to pay the demands? A. Yes, sir.''

On September 6th Hanna was working for another company and wrote Redmon to come to Pattonsburg, saying among other things, ''You and I can pick up enough money to pay everything and have some besides.'' With reference to that letter he testified:

''Q. What do you refer to by this statement that you and he can pick up enough money to pay everything and have some besides? A. To pay these claims,

these rejected requests of the Minnesota Mutual Life Insurance Company.

"Q. The copartnership at that time was behind on those rejections? A. Yes, sir.

"Q. And it was your idea if you and Redmon could get this money which you refer to, as the easiest you ever saw, up there, that the firm of Hanna & Redmon might be able to pay back these moneys, your rejected requests? A. Yes, sir, exactly what I meant.

"Q. And these very rejected requests included Clarkson, Payne, Ellis and Short? A. Yes, sir, those were the ones I had.

"Q. The four we talked of a while ago? A. Yes, sir.

"Q. At that time you were short and unable to pay? A. I never denied responsibility for the claims.

"Q. You knew you were short then? A. Yes, sir.

"Q. And that is the reason you asked permission to resign? A. Yes, sir.

"Q. Because you were short? A. I had paid off many of my payments."

Mr. Bremmerman, who, according to plaintiff's testimony, was consulted by Hanna and advised Hanna that he could offset the amounts paid by him on account of sub-agents against what was due him from the company, did not testify in the cause.

Mr. Tolle, a lawyer representing the plaintiff, wrote a letter to the company, which contained the following:                    "Oct. 17, 1904.

"St. Paul, Minn., Oct. 17, 1904.

"The Minnesota Mutual Life Ins. Co.,

"Gentlemen: Mr. Rosenberger, attorney-at-law, Kansas City, Mo., advised me today that your Mr. O'Shaughnessy has employed him to collect and furnish the local prosecuting attorney sufficient or the necessary data to convict J. M. Hanna, my client, and one of your former managers, on a charge of converting the company's money to his own use in the sum of

about $800; and also one Johnson on a similar charge. in the sum of about $700.

"In reference to this matter, in so far as Mr. Hanna is concerned, I beg to advise that my understanding of the matter is that Mr. Hanna is entitled to certain moneys to be paid to him from the Minnesota Mutual Life Insurance Co. on account of certain life insurance policies solicited and secured by him for the company upon which he has not received his commission, but that the same are now in the hands of the company's cashier and one Mr. Redmon, and that if Mr. Hanna is indebted to the company, such indebtedness arose out of his contractual relations with the company, which indebtedness, if any there be over and above his claim against the company, he is able, ready and willing to pay."

In that letter no mention was made of any claim on account of money paid for sub-agents.

Mr. Tolle was a witness in the case. He testified among other things as follows:

"Q. Just what was that advice that you notified Hageman of, in Hanna's presence—that you gave? A. As near as I can remember the advice was that we wouldn't permit Mr. Hanna to pay the amount claimed against sub-agents for the reason that we considered that the sub-agents were not sub-agents of Hanna, but direct employees and agents of the company.

"Q. That of course was on the theory that Mr. Hanna didn't have the money from the sub-agents that that advice was given? A. The effect of that was not discussed so far as I was concerned.

"Q. It would make a vast difference in your opinion, would it not? A. I don't know that it would, because I haven't distinctly in mind all the circumstances that led up to the conversation or what the exact conversation was.

"Q. Was it not their claim that one sub-agent named W. P. Johnson, had on account of one Hiles,

who lives at Holden, in Missouri, collected $102.80, on an application that had been rejected, and gave Mr. Hanna $41.12 of that money, and that Hanna had the money and that the applicant wanted it back and the company had to pay it back? A. No, sir.

"Q. That didn't come out—do I understand you to say that in such a case it would have made no difference in your advice whether or not Hanna had got his share of the commission and kept it, and the application rejected and the man wanted it back, and the company's share, too. Did you take the position that he was entitled to keep that money? A. My advice at that time was made on specific facts I had before me, and not having these facts now, I don't know how I can answer your question satisfactorily.

"Q. What facts was it you had? A. I don't know just the facts that were presented at that time, if at all, and discussed at that time, but my opinion was formed at that time and I don't remember at this time just exactly what the fact was, or what the definite advice I gave my client was, except generally I refused to permit him to pay money that was due the company from sub-agents.

"Q. Now, to refresh your recollection, you are very certain, are you not, that you didn't give any such advice in the case where Hanna had in fact obtained the money belonging to the company and his share of the commission from the sub-agent? A. That state of facts wasn't submitted to me at that time. The only answer I can make is, no such proposition came up, and no such advice was given, unless it was given on specific facts, and not having those facts before me at this time, I don't remember just what the advice was."

It will thus be seen that he does not in that evidence discuss the liability of the company to plaintiff for sums paid by plaintiff on account of sub-agents, but confines himself to a denial of plaintiff's liability

for such items as had not yet been paid by him. It will be noted that Mr. Tolle did not distinguish between a case where the sub-agent had paid to Hanna and those cases where Hanna had not received the money.

Among the instructions, the jury were told that under the agency contract the company was not liable to Hanna on account of any money paid by him to discharge any liability of sub-agents, or liability arising from acts of sub-agents, and also that there was no evidence to show that the company owed Hanna at the date of his conference with Hageman or thereafter, or that it was indebted to him at the time when he received the Ellis, Plank, Clarkson and Short notes, and that Hanna had no right for his own purposes to sell those notes, and had no right to use any part of the proceeds of those notes for his own purposes. The court also instructed that all notes and money received by plaintiff for the company, whether by himself or through sub-agents, were held by him as a fiduciary trust.

The evidence for the plaintiff showed that the criminal prosecutions were carried on at the suggestion of the defendant, and that the defendant threatened the plaintiff with prosecution unless he paid the full amount demanded.

It was admitted on the trial that the fifth item in defendant's statement, known as the Baffrey item, had never been paid by the company and that plaintiff held the Baffrey note.

Plaintiff's evidence tended to show that he expressed a willingness to pay whatever should be found due from him.

The foregoing statement is of facts conceded by the plaintiff. We have not undertaken to present the defendant's contention as to the facts.

I. Counsel for respondent in their brief say, "It is apparent, we say, that there never was any thought between the company and Hanna that their relations

were of a fiduciary character, or that the monetary matters between them were simply matters of accounting to be settled from time to time, until after Hanna left the service of the company and other reasons intervened, bringing about a change of attitude.''

The trial court found against them on that proposition, and so do we. It is true that when he settled up on his first contract he failed to account for some notes that had come into his possession under a contract of agency in which were the same terms as in the last contract of agency; and the company permitted him special favors in order to enable him to pay for those notes. But that was no authority for him to repeat the offense, especially when the new contract contained the clause making all funds received by plaintiff a trust fund not to be used by the agents for any purpose whatever, but to be remitted to the company. The plaintiff claims that right after the contract of January 16th, O'Shaughnessy directed him to sell all notes at once. Even if that be true, an authority to an agent to sell is not permission to convert the proceeds to the agent's own use. To make the matter all the stronger, the company on April 18, 1904, wrote plaintiff a letter calling his attention to the fact that he had sold a note and failed to reimburse the party who was entitled to it. That letter called plaintiff's attention specially to the clause in the contract making those notes a fiduciary trust and roundly censured him for not attending to it, and told him that his conduct was ''an unlawful conversion of another's property.''

II. In State v. Mispagel, 207 Mo. l. c. 580, it was held: ''It must, however, be observed that our statute does not make a failure to account for a trust fund, or a fund received by an agent or officer, an offense, but the essence of the offense is the wrongful conversion of the fund; and while failure to account for such fund may constitute very material evidence tending to establish the act of conversion, yet the failure to account

by no means constitutes the offense of embezzlement of the fund."

"Embezzlement is the fraudulent and felonious appropriation of another's property by a person to whom it has been entrusted or into whose hands it has lawfully come." [State v. Casey, 207 Mo. l. c. 11.]

It was held in State v. Wissing, 187 Mo. 96, that a prosecution for embezzlement of a certain sum could be sustained by showing the embezzlement of any portion of that sum. It is so provided as to money or notes in Revised Statutes 1899, section 2531.

Plaintiff testified that up to the time of his talk with Mr. O'Shaughnessy about the middle of August he had made no claim against the company on account of money paid out for sub-agents.

He further testified that when he wrote on September 6th to Redmon, saying, "You and I can pick up enough money to pay everything and have some besides," he meant that they could pick up enough to pay the Clarkson, Plant, Ellis and Short items. That he knew he was short, and for that reason asked permission to resign. It is thus seen that he made no claim for reimbursements on account of sub-agents until the middle of August when he spoke of resigning. The items which he was charged with embezzling came into his hands from a month to two months before his talk with O'Shaughnessy and before any claim made by him. Instead of taking premium notes payable to the company, he took them payable to himself, immediately cashed them, making no entry on the books, and used the money for his own purposes, except what he paid sub-agents, and that was refunded to him and spent by him. Even if the sub-agents did not refund until after plaintiff claimed the right to hold it, that part which had been converted by him before he made such claim was not affected by such claim.

All authorities hold that the offense of embezzle-ment is complete at the time of the conversion, and is not tolled by subsequent claims or efforts at atone-ment.

We, accordingly, refrain from passing on the ques-tion of the good faith of plaintiff's claim to offset pay-ments to sub-agents.

The admitted facts show a conversion of part of those items before any such claim was made or enter-tained in his own mind by the plaintiff. Such con-version was a fact from which the jury in the criminal prosecution would be authorized to infer the criminal intent. [State v. Lentz, 184 Mo. l. c. 239.]

There is no evidence in this cause to rebut such inference.

"When the facts are undisputed, it is the duty of the court to declare their legal effect; when they are disputed, it is for the jury to determine the question under proper instructions from the court." [Carp v. Insurance Co., 203 Mo. l. c. 351.]

We hold that there was probable cause for the prosecution. In no case can an action for malicious prosecution be sustained where there was probable cause. [Stubbs v. Mulholland, 168 Mo. l. c. 74.]

We find nothing in the case to indicate that on another trial the plaintiff could show a cause of action, hence we reverse the case without remanding it. *Blair, C.*, concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.