John **DODSON**, Respondent,

v.

**MFA INSURANCE COMPANY**
and
**Countryside Casualty Company**, Appellants.

No. 57286.

Supreme Court of Missouri,
Division No. 1.

May 13, 1974.

Motion for Rehearing or to Transfer to Court en Banc Denied June 10, 1974.

Lantz Welch, Kansas City, Martha Sperry Hickman, Independence, for respondent.

Thomas A. Sweeny, Kansas City, for appellants; Popham, Popham, Conway, Sweeny & Fremont, Kansas City, of counsel.

WELBORN, Commissioner.

Action for malicious prosecution. Jury awarded plaintiff $15,000 actual damages and $200,000 punitive damages. Defendants' motion for new trial was overruled; judgment entered on verdict; defendants appealed.

In March, 1962, plaintiff John Dodson resided at Brookfield, Missouri. He was then some 36 years of age, a veteran of World War II who had lost a leg in that war, and had had less than one year of high school education. In November, 1961, Dodson purchased a 1961 GMC truck from Gilbert Motor & Oil Co. of Brunswick. The price of the truck was $4,342. Dodson paid $525 cash and traded in a pickup truck for which he was allowed credit of $1,117. He financed the balance of the purchase price through Yellow Manufacturing Acceptance Corporation (YMAC), by means of a chattel mortgage on the truck to secure an indebtedness of $3,279.90, which was to be paid at the rate of $109.33 per month, beginning January 4, 1962. Dodson obtained comprehensive insurance coverage of the truck through an MFA Insurance Company agent in Marceline. The policy was written by the Countryside Casualty Company, a subsidiary of MFA.

Dodson used the truck in a general hauling operation, principally of farm products.

On March 21, 1962, a YMAC representative told Dodson that he had made only one payment and that he was delinquent in two payments. Dodson told the YMAC man that he had made a second payment for which he had not received credit.

At around 5:00 A.M., March 22, 1962, the Brookfield volunteer fire department responded to a call that a truck was burning on what was known as Cemetery Road, a gravel road outside the city limits of Brookfield. A member of the fire department notified Sergeant Conyers of the State Highway Patrol of the fire. Cemetery Road was in poor condition and the fire truck was unable to get through a mudhole some distance from where the truck was burning. Firemen took dry chemicals to the scene of the blaze and extinguished the fire. The truck was Dodson's and Dodson was present.

Sergeant Conyers arrived at the scene at about the time the fire was extinguished. He asked Dodson about the fire and Dodson told him that he was driving west and the truck backfired a couple of times. "I smelled something and got out and lifted the hood and there was fire around the carburetor. It started spreading into the cab so I left and tried to get help." That was the statement which the trooper put in his accident report and "Report of Burned Vehicle" which he prepared after he had been at the scene and had taken Dodson to the Brookfield police station where the reports were prepared.

A little after 8:00 A.M. a tow truck was dispatched to remove the burned truck. Sergeant Conyers also returned to the scene of the fire. The tow truck operator found a cork gasket at the rear of the truck. The gasket had the odor of fresh gasoline and was turned over to Conyers. Conyers and a Brookfield policeman made a further search of the area. In a field some 90 feet to the rear of the truck and 75 feet from the road, Conyers found a five-gallon gasoline can that contained a little more than a gallon of gasoline. The filler cap of the can was removed. It had no gasket. The gasket found behind the truck fit the filler cap. The morning was frosty and neither the gasket nor the can had frost on it.

The discovery of the gasket and can, coupled with the fact that the fire had been concentrated in the cab of the truck, led Conyers to suspect that the fire had been set.

Conyers had learned from Dodson that the truck was insured by MFA. Conyers knew Harry Hansen who was employed by MFA as a special investigator to investigate fire losses when there was evidence of the questionable origin of a fire. Hansen was a former member of the highway patrol and had been Conyers' troop commander for about three years when Conyers joined the patrol in 1942. Conyers got in touch with Hansen and Hansen came to Brookfield around noon on March 22. Conyers drove Hansen to the scene of the fire and then took Hansen to the place where the burned truck had been towed. Hansen examined the vehicle and took photographs of it.

Hansen and Conyers then went to Dodson's residence. Dodson refused to talk in the presence of Conyers. Conyers and Hansen went back into town and Hansen returned alone. Although Dodson had said he would talk to Hansen if he was alone, Dodson was not at home when Hansen returned. Hansen returned to the house several times during the evening, but Dodson was not there.

At around 8:00 A.M. on March 23, Brookfield police picked up Dodson and took him to the police station. Hansen was at the station and he assisted Dodson in the preparation of a sworn statement in proof of loss, in which Dodson set forth his claim for loss under his insurance policy of $2,500.

On either March 22 or 23, Conyers and Hansen talked with Robert Devoy, the

prosecuting attorney of Linn County, and laid before him the information which they had gathered. Devoy filed a complaint in the Linn County Magistrate Court, charging Dodson with arson of insured property. § 560.030, RSMo 1969, V.A.M.S. Dodson was arrested on the afternoon of March 26 on a warrant issued on the complaint. Devoy and Conyers saw Dodson after his arrest and, after advising Dodson of his rights, asked him if he wanted to make a statement. Dodson said that he had nothing to say except that he was innocent. Dodson was jailed and later released on bond. After preliminary hearing, Dodson was bound over to the circuit court. Hansen testified at the preliminary hearing. An information was filed and the case was tried before a jury on January 16 and 17, 1963. The jury returned a verdict of not guilty. The cause of action for malicious prosecution was filed February 17, 1965.

Dodson testified to the purchase of the truck about four months before the incident in question. He had trouble with the truck backfiring. The truck was worked on but it continued to backfire.

Dodson testified that, on the evening of March 21, 1962, he went to the Do Drop Inn and Wilma's Tavern where he stayed till midnight. Then he went to the Duck Inn where he ate dinner and visited over coffee till two or three A.M. When he left he headed east on Highway 36 and encountered a motorist out of gas. Although the motorist said that he had already sent for help, Dodson volunteered to drive back to the Duck Inn Service Station for gas. There was no other station within 15 or 20 miles that was open. Dodson asked for a gallon of gasoline, and gave the attendant a dollar. The attendant ran "a gallon or so" in a five-gallon MFA can and since there was a deposit on the can, he kept the dollar. Dodson put the can on the right-hand seat of the truck, drove back to where he had left the motorist and he was gone.

Dodson, having no job for the next day and being separated from his wife, decided to drive around. He drove past his room and then westbound on Cemetery Road. He experienced "quite a bit of trouble" getting through the first mudhole encountered, both the wheels spinning and the motor backfiring.

Dodson went a "ways farther" and encountered another mudhole. The truck was still backfiring and the wheels spinning. He pulled it through but the "truck seemed like it was getting hot and I smelled something." He stopped, got out, raised the hood and "it was on fire around the motor someplace." He went around to the right side of the cab, "took the can of gasoline out and started up the road to get away from it" and "threw it over into a field." Dodson then headed back up the road and attempted to summon help at one house with no success and continued on to the second house, that of "Peg" McCollum. He knocked on the door but McCollum didn't respond right away. Dodson knocked again and yelled, "Good God, man get up—my truck's on fire." McCollum responded this time and Dodson came in, called the fire department, then "set down on the porch and held his head down in his hands."

Harold "Peg" McCollum, who lived within fifty feet of the first mudhole, was awakened by a terrific noise like a motor backfiring, raised up out of bed and saw a truck that was smoking with its "underneath part—all lit up like it could have been on fire." The mudhole had been caused by the melting of a big snowdrift and a number of vehicles had been "stuck in this low place." McCollum testified to Dodson's coming to his house and calling the fire department.

Audra Borron, an employee of the Duck Inn Service Station, testified that he sold thirty cents' worth of gasoline to Dodson in the early morning of March 22.

Sergeant Conyers testified for the defendants that, when he first went to the scene of the fire and spoke with Dodson, he did not suspect arson. His original accident report made no reference to Dodson's" statement that he had been accompanied by a woman, but the report did note the finding of the gas can and suspicion of arson. When Conyers returned to the scene, his suspicion was aroused by the finding of the gas can, the loose gasket, the fact that the right door of the truck was open and the left door closed. He wrote an investigation report in which he noted those factors, as well as the MFA insurance and Dodson's being delinquent in his payments on the note. This report was dated March 24. Conyers acknowledged that, although he suspected a crime had been committed, he did not ask patrol experts to study for evidence but instead got in touch with Hansen.

Mr. Robert Devoy, Linn County Prosecuting Attorney, testified that he was told first by Conyers about the suspicious circumstances surrounding the fire and later talked with Conyers and Hansen. He testified that he would not have instituted a criminal charge without expert testimony that the fire was of incendiary origin and that he relied upon Hansen for such expert testimony.

Hansen did not testify in the malicious prosecution case. Plaintiff's evidence in the case was that Hansen did testify at the preliminary hearing on the charge against Dodson. He testified to his opinion as to whether the fire could have started from a backfire and as to how the fire started. Just how he testified on these matters was not actually shown, but the clear inference was that his testimony was favorable to the state on both issues. Hansen also testified at the trial of the arson charge.

Hansen's deposition testimony was used by plaintiff in the malicious prosecution action. In it Hansen stated that in his investigation he interviewed only Dodson, and made no effort to speak to McCollum or to locate the source of the gasoline can. He took no steps to have scientific tests made of the ground under the truck or of the unburned portion of the seat padding in order to establish evidence of the presence of an accelerant. He denied that he talked to Devoy before Devoy filed the arson charge. He denied that he made any recommendation against payment of the claim of Dodson or about repossession of the burned truck. He denied that he got the sworn proof of loss from Dodson in order to provide the basis of a criminal prosecution. He stated that he formed the opinion that arson had been committed from the way the truck burned and the presence of the gasoline can.

Plaintiff introduced in evidence portions of a "Confidential and Privileged" memorandum, dated March 23, 1962, written by Hansen, and taken from the file of the prosecuting attorney. The memorandum dealt with Hansen's investigation and included the following:

"About 8:00 a.m., March 23, 1962, the Brookfield Police picked our insured up and brought him to the police station and I interviewed him there. I took from him a loss report which he signed, which is in the file and also had him sign a proof of loss and affidavit form. Before he signed this I went over the affidavit in great detail and he stated he understood it perfectly.

"Sergeant Conyers and I talked to the Prosecuting Attorney of Linn County, Robert DeVoy and we explained to him why we felt this was not an accidental fire. Sergeant Conyers later told me he thought the prosecuting attorney was going to file arson charges against our insured concerning this fire. This is one reason why I wanted to be sure that our insured gave us a sworn statement in proof of loss and he understood it thoroughly before he signed it. This was in case he decided to withdraw his claim to avoid prosecution.

\* \* \* \* \* \*

"If the net payoff of this truck to Y.M. A.C. is below what we determined to be

the actual cash value at the time of the loss, I think we should settle with Y.M.A.C. as loss payee only and not include our insured. Then, require them to endorse their note and mortgage to Countryside Casualty of Columbia, Missouri, without recourse and in the event our insured is prosecuted while we are able to decline the coverage as far as he is concerned, then I think we could repossess this truck and rebuild it and dispose of it and recover part of the money we have paid Y.M.A.C. We can also file suit against our insured as being advisable and get a judgment against him."

An expert witness called by plaintiff at the trial testified that, based on the photographs of the burned vehicle and the available evidence as to the fire's inception, there was nothing to indicate that the fire was of incendiary origin. He testified that in investigation of arson cases involving automobiles the soil underneath the burned vehicle is routinely examined very carefully to find traces of accelerant which might have been used. The gas chromatograph is widely used for such purpose in arson investigations. Another expert testified that backfiring through the carburetor could have caused a fire such as here involved. He was of the opinion that the fire did not start in the cab of the truck and spread to the motor.

An expert testified on behalf of the defendants that, based on the information he had about the case and examination of the photographs of the burned vehicle, the fire was an arson fire. He was of the opinion that the extreme burning of the cab area indicated either that it was a long burning fire or the fire had been stimulated by an accelerant. He was of the opinion that the condition of the motor area in numerous regards did not indicate a fire of such intensity in that area as would have spread from the motor to the cab.

Appellants assert that the trial court should have sustained their motions for a directed verdict at the close of all the evi-dence because plaintiff failed to prove that the criminal prosecution was without reasonable grounds. This is, in effect, an assertion that the evidence on the existence of reasonable grounds was undisputed, leaving the question of the legal effect of such evidence for the court, not the jury. Carp v. Queen Ins. Co., 203 Mo. 295, 101 S.W. 78, 96 (1907); Hoene v. Associated Dry Goods Corporation, 487 S.W.2d 479, 483–484 [7–9] (Mo.1972). Inasmuch as respondent charged that MFA, acting through Hansen, instigated the prosecution and appellants do not question that the evidence supports a finding favorable to respondent on that issue, the question becomes one of Hansen's having probable cause for his action, not whether the prosecuting attorney had probable cause for filing the complaint and carrying on the prosecution.

There can be little question that the occurrence did involve circumstances giving rise to suspicion that the fire was the result of arson—the time and place of the fire, the presence of the accused, the fact that the accused was having difficulty in making the payments due on the truck, the discovery near the scene of material which might have been used as an accelerant for the fire, the discovery of the gasket which indicated that a container for an accelerant had been opened near the scene of the fire, and the nature of the damage to the truck.

Hansen had knowledge of these facts and circumstances when he presented the matter to the prosecuting attorney and expressed the opinion that the fire was of incendiary origin.

The evidence of the existence of the circumstances relied upon by Hansen was basically uncontradicted. Respondent denied having opened the gasoline can at the scene of the fire and made no effort to explain the presence of the gasket. However, the evidence that such a gasket was found was uncontradicted.

Basically, respondent's position is that the above-cited circumstances were not

sufficient to provide reasonable grounds for Hansen's actions because of what respondent claims were deficiencies in the investigation conducted by Hansen. He enumerates such deficiencies as follows:

" * * * Hansen, the arson expert, violated all the axioms of criminal investigation. He failed to secure physical evidence; failed to utilize scientific tests available to him; failed to determine the source and amount of the hypothesized offending accelerant; failed to interrogate the suspected arsonist regarding the source and amount of the hypothesized offending accelerant; failed to determine the preexisting condition of the truck when witnesses to such information volunteered such information to him; failed to check the scene or interview witnesses; failed to exercise any of his expertise other than to make a cursory inspection of the truck and perfunctorily interview Dodson."

■ The charge that Hansen "violated all the axioms of criminal investigation" was based upon the testimony of respondent's expert witness, Joseph D. Nicol, Professor of Criminal Justice at the University of Illinois, and a former advisor to the President's Commission on Law Enforcement and Criminal Justice and consultant to the Warren Commission on the assassination of President Kennedy. The test of probable cause is whether the facts and circumstances would warrant a belief in an ordinarily cautious person that another had committed a crime. Kvasnicka v. Montgomery Ward & Co., 350 Mo. 360, 166 S.W.2d 503, 513 [10] (1942); Higgins v. Knickmeyer-Fleer Realty & Investment Co., 335 Mo. 1010, 74 S.W.2d 805, 813 (1934).

■ Failure to make such investigation as the circumstances reasonably warrant will result in the issue of probable cause being considered in the light of knowledge on the part of the prosecutor of the facts which such investigation would have disclosed. Carp v. Queen Ins. Co., 203 Mo. 295, 101 S.W. 78, 91 (1907). In this case there is no evidence of what the scientific tests which respondent says should have been made would have disclosed. Hansen's deposition testimony was not clear as to whether or not he asked respondent about the gasoline can. However, respondent's own testimony was that Hansen did ask him and that he lied to him about it. It is difficult to see how respondent may take advantage of this aspect of the claimed lack of investigation.

Insofar as facts subsequently are concerned, investigation might have uncovered McCollum's account of the truck passing his house shortly before the fire. McCollum's house was ¾ of a mile from where the truck came to a stop. Except for the evidence that the truck was backfiring, McCollum's account is difficult to reconcile with any other version of the inception of the fire, including respondent's.

The only other factual evidence was the filling station attendant's story of the sale of gasoline to respondent. The knowledge of such transaction would not have been necessarily inconsistent with the belief of Hansen in the guilt of respondent. Earlier knowledge of the attendant's story might have resulted in a closer analysis of the volume of gasoline in the can found near the scene, but, as a matter of common knowledge, only a small quantity of gasoline is necessary to start a fire.

The testimony of neither McCollum nor the attendant was exonerative and failure to learn of the two witnesses prior to the presentation of the matter to the prosecuting attorney is not such lack of diligence as would impugn a good faith belief in the guilt of Dodson on the basis of the known facts and circumstances. Kvasnicka v. Montgomery Ward & Co., 350 Mo. 360, 166 S.W.2d 503, 513 [10] (1942).

■■ On the facts and information before Hansen, this court concludes as a matter of law that reasonable cause for his action existed. There was *no occasion to*

**468**

submit to the jury for its determination the circumstances under which Hansen acted. Those circumstances are revealed by evidence on which there was no conflict and the only question under the evidence was whether or not Hansen's "conduct measured up to the standard of a reasonable man," a question of law and not one of fact in a case such as this. 3 Rest. of Torts § 673, p. 436 (1938).

Some states have adopted the rule, suggested by respondent, that the issue of probable cause is for the jury "where more than one conclusion may be drawn as to the reasonableness of the defendant's conduct * * *." Prosser on Torts, § 119, p. 847 (4th ed. 1971). Missouri, however, adheres to the rule here applied. Hoene v. Assoc. Dry Goods Corporation, 487 S.W.2d 479, 483 [7–9] (Mo.1972); Hanna v. Minnesota Mut. Life Ins. Co., 241 Mo. 383, 145 S.W. 412 (1912).

■ There were statements in the confidential memorandum of Hansen which indicate a major concern on his part with avoiding payment of an insurance claim. However, such improper purpose on his part is not evidence of lack of probable cause. "The fact that the defendant initiated or continued the prosecution, or procured it, for an improper purpose, such as to put pressure on the accused and compel him to-make payment of a private debt, is not in any way inconsistent with his reasonable belief in the guilt of the accused, and the existence of grounds reasonably justifying that belief. It cannot be assumed that even for such an improper purpose the defendant has taken the risk of bringing to criminal prosecution one whom he does not believe to be guilty, and against whom he does not believe that there is sufficient evidence to obtain a conviction. Accordingly, it may not be inferred from evidence of an improper purpose alone that there was not probable cause; and the burden of proving the latter by independent evidence remains upon the plaintiff." Rest. of Torts, Second, Tent. Draft No. 13,

§ 669A, p. 168 (1967). See Smith v. Glynn, 144 S.W. 149, 151 (Mo.App.1912).

Judgment reversed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.